## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| EMADEDDIN Z. MUNTASSER | ) )  ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| MUSTAFA SABBAGH,<br>MAHMOUD SABBAGH,<br>M. YASER TABBARA,<br>GHASSAN HITTO,<br>SABBAGH INVESTMENT GROUP,<br>İNCE GOLD ALTIN KUYUMCULUK<br>VE DIŞ TİCARET ANONİM ŞİRKETİ | ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Civil Action No. _____

## **COMPLAINT**

### **Introduction**

1.      This action arises out of Defendants' wide-ranging, international conspiracy to defraud, which targeted Massachusetts resident, Plaintiff Emadeddin Muntasser (among others), and resulted in the theft of Muntasser's life savings, which he earned from a lifetime of hard work.  Defendants, while both in the United States and abroad, intentionally reached into Massachusetts to solicit and induce Muntasser to invest in their fraudulent scheme through a coordinated series of false statements and documents, which they made and disseminated to Muntasser in Massachusetts.

2.      Muntasser grew up in Tripoli, Libya.  He came to the United States in 1981 at his father's behest when Libya descended into oppression and authoritarianism.  His life story is the

American Dream, personified by merit, integrity, and vision.  After earning a Bachelor's of Science Degree with Honors and a Master's Degree in Electrical Engineering and Artificial Intelligence from Worcester Polytechnic Institute, Muntasser successfully built and developed businesses in the retail, real estate, and roof safety sectors.  Today, he is the holder of several patents.  In addition to his successful business ventures, Muntasser is an activist, committed to expanding human rights across North Africa and the Middle East through support of foundations and Non-Governmental Organizations ("NGOs") aimed at fostering human potential and alleviating suffering.  He created the Muntasser Foundation, a private nonprofit, in service of these values with the plan to use profits generated from his investments to support these charitable endeavors.  Defendants' brazen fraud scheme shattered Muntasser's successes.

3.      Together, Defendants, led by Mustafa Sabbagh ("Mustafa"), executed an elaborate affinity scam targeting members and sympathetic allies of the Syrian exile community, including Muntasser, that share similar political, social, economic, and moral aspirations and goals.

4.      Defendants built their fraudulent scheme utilizing three interlocking, reinforcing, and synergistic pillars – Political, Philanthropic, and Economic – which they used first to induce their victims to invest substantial amounts of monies, then to conceal for as long as possible their massive fraud, and finally, once the victims detect the fraud, to try to prevent them from seeking any remedy with threats and extortion.

5.      The first pillar is Political power and authority.  Three of the co-conspirators— Mustafa, M. Yasser Tabbara ("Tabbara"), and Ghassan K. Hitto ("Hitto")—are well-known leaders within the Syrian exile community who held senior leadership positions in the formation and development of the Syrian interim government in 2011 to counter, and potentially replace,

2

the regime of Bashir Al-Assad.  Defendants used their political standing to create an aura of credibility within elite political, business, and philanthropic communities across Syria, Turkey,[1] and the United States.

6.      The second pillar is Philanthropic work and charity.  Together with their political connections and access, Mustafa, Tabbara, and Hitto founded an NGO called the Syrian Forum, which operates as a 501(c)(3) charitable organization to support people displaced by the ongoing Syrian civil war.  The Syrian Forum has an active presence and office in the United States and annually raises millions of dollars for its charitable endeavors from donors in the United States and European Union nations with an emphasis towards soliciting wealthy benefactors.  Mustafa, Tabbara, and Hitto have misused their positions within the Syrian Forum for at least two sinister reasons – (i) identifying new targets to support their ongoing fraudulent scheme, and (ii) telling victims that the Syrian Forum will be permanently impaired in its work if the defendants' criminal conduct is exposed.

7.      The third pillar is Economic.  Defendants operate through an entity doing business as Sabbagh Investment Group ("SIG"), which they use to offer their victims an opportunity to make what they claim will be lucrative investments in Turkish real estate, hotel, and cash exchange and currency transfer sectors.  Unfortunately, this is nothing more than an elaborate affinity scheme that is criminal to its core.  Defendants operate a Ponzi scheme, in which they recruit new investors whose funds are secretly used to pay off old investors, who are in turn told that they have generated legitimate profits.  In fact, Defendants misappropriated investor funds for undisclosed business interests and to support their lavish lifestyles.  For instance, Mustafa owns a large, waterfront home in Bosporus, Turkey – one of the wealthiest and

---

[1] Today, there are approximately 3.6 million Syrian refugees residing in Turkey.

most coveted areas in the country – with the service of two drivers for his collection of luxury cars, largely paid for by duped investors such as Muntasser.

8. Muntasser became a target of the Defendants' criminal conduct, here in Massachusetts, through a series of persistent, direct, and organized solicitations in which Defendants fraudulently induced Muntasser to invest $4 million—most of his life savings—in İNCE GOLD ALTIN KUYUMCULUK VE DIŞ TİCARET ANONİM ŞİRKETİ ("İNCE Gold"), a Turkish joint stock company controlled by Mustafa. Mustafa operates and controls İNCE Gold through SIG. As detailed *infra*, Defendants falsely represented that Muntasser's investment would be used strictly to support İNCE Gold's licensed money transfer and currency exchange business and assured Muntasser that his money would be carefully guarded and managed. At the time Defendants made these representations to induce Muntasser to invest with them, they knew they were false. As Defendants knew and intended, Defendants misappropriated Muntasser's investment to fund Mustafa's unrelated and failing hotel business and for their own personal expenses.

9. To conceal their fraudulent scheme, Defendants created and disseminated falsified monthly investment statements purporting to show profits Muntasser's investments earned. Incredibly, Defendants continue to this day to create these false statements, despite Mustafa having confessed to Muntasser that his profits are illusory.

10. Once caught, Mustafa concocted a brazen lie in an effort to shield himself from any consequences of his fraud. He falsely told Muntasser that a rogue company insider stole Muntasser's investment and then fled. Further, as he has done with other disgruntled investors, Mustafa tried to intimidate Muntasser into accepting a nominal return of his investment by claiming Muntasser could get wrapped up in İNCE Gold and SIG's illegal activities, and

4

implying that if Muntasser exposed Defendants' fraud, the corresponding publicity would destroy the Syrian Forum. Muntasser refuses to acquiesce to Mustafa's threats and become yet another silent victim of Defendants' longstanding affinity scam.

### Parties

11.     Muntasser is a citizen of the Commonwealth of Massachusetts residing in Sudbury, Middlesex County.

12.     Mustafa resides in the nation of Turkey and has dual Syrian and Turkish citizenship. He operates SIG with his son, Defendant Mahmoud Sabbagh ("Mahmoud"). Mustafa is an influential member of the Syrian exile community serving in various functions with the Syrian interim government that attempted to replace the Syrian regime under Bashar Al-Assad. At one point, he served as secretary-general for the interim government. He has strong connections to people in Qatar, the UAE, and other Gulf States.

13.     Mahmoud is Mustafa's son and has dual Turkish and Syrian citizenship. He aided and abetted Mustafa's fraudulent conduct by, among other things, knowingly creating and disseminating false company records to investors, including Muntasser, to trick them into believing they had invested in legitimate companies and that their investments had generated profitable returns. Upon information and belief, Mahmoud lives in Turkey.

14.     Defendant Hitto maintains a home near Murphy, Texas, and lived in the area from approximately 2001 to 2012. He is not a citizen of Massachusetts. Hitto has dual U.S. and Syrian citizenship, and upon information and belief also has Turkish citizenship. Hitto solicited potential United States investors for SIG, including Muntasser. Hitto served in a senior management capacity with SIG during the relevant time periods, and he is a partial owner of SIG. When the Syrian interim government formed, he served in the vital role of acting Prime

Minister. He co-founded the Syrian Forum. Upon information and belief, Hitto successfully raised millions of dollars from approximately 20-30 United States investors over the past five years. Hitto was paid between $10,000 and $15,000 a month to secure new investor funds for SIG.

15.     Defendant Tabbara is a U.S. citizen residing in Chicago, Illinois, and upon information and belief is also a Turkish citizen. Tabbara is a licensed attorney in the State of Illinois who solicited potential United States investors, including Muntasser, on behalf of SIG. Tabbara served as a manager of SIG during the relevant time periods. He previously served as a legal advisor for the President of the Syrian interim government in its formative years. He co-founded the Syrian Forum. Upon information and belief, Tabbara successfully raised millions of dollars from approximately 20-30 United States investors over the past five years. Tabbara was paid between $10,000 and $15,000 a month to secure new investor funds for SIG.

16.     SIG is an unincorporated entity operating as a tradename for various companies operating in Turkey. It is controlled and operated by Mustafa and Mahmoud.

17.     İNCE Gold is an affiliate of SIG and is controlled and operated by defendants Mustafa and Mahmoud. İNCE Gold operates under the İNCE brand of companies, which provide currency exchange, money transfer, and precious metal trading in Turkey. İNCE has a central retail location in the Sultanahmet/Lalali District located in the heart of Istanbul's commercial area.

## Jurisdiction & Venue

18.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds $75,000.

19.     Venue is proper pursuant to 28 U.S.C. §§ 1391 (b)(1) & (2) because a substantial part of the events giving rise to this complaint occurred in the District of Massachusetts.

20.     This Court has personal jurisdiction over all the Defendants pursuant to the Massachusetts long-arm statute, G. L. c. 223A § 3 (a), (c), and (d).

21.     Among other things, Mustafa committed the following acts, which subject him to the jurisdiction of this Court: (i) acting as the CEO of SIG with authority to direct and approve the activities of Tabbara and Hitto, with knowledge of the purpose and intent of their activities being to raise capital through the sale of securities to Muntasser in Massachusetts; (ii) endorsing and approving the capital raising activities of Tabbara and Hitto, who acted as agents for SIG; (iii) corresponding via Zoom, email, and phone as part of the solicitation and negotiations process with Muntasser, knowing that Muntasser was in Massachusetts during all such communications; (vi) executing fraudulent contracts[2] on behalf of İNCE Gold with Muntasser, knowing that Muntasser was in Massachusetts; (v) issuing certificates reflecting Muntasser's investment interest in İNCE Gold and electronically transmitting them to Muntasser, knowing he would receive them in Massachusetts (*see* Ex. 5); (vi) knowingly creating falsified monthly financial statements that were transmitted to Muntasser, knowing he would receive them in Massachusetts; (vii) causing wire transfers to be transmitted to Muntasser, knowing he resided in Massachusetts; (viii) accepting wire transfers from Muntasser, knowing the transaction originated in Massachusetts; (ix) fraudulently negotiating profit-share percentages with Muntasser, knowing that Muntasser was in Massachusetts during the negotiations; and (x)

---

[2] One such contract listed Muntasser's home address as being in Massachusetts.     *See* Ex. 3, at 9.

specifically targeting other U.S.-based investors in Massachusetts and elsewhere, including inviting approximately 20 potential investors from New England to meetings in Massachusetts.

22.     Among other things, Mahmoud committed the following acts, which subject him to the jurisdiction of this Court: (i) knowingly creating and disseminating falsified monthly financial statements and directly transmitting them to Muntasser, knowing he would receive them in Massachusetts; and (ii) aiding and abetting others in the commission of the fraudulent scheme targeting Muntasser, knowing that Muntasser was in Massachusetts at all relevant times.

23.     Among other things, Tabbara committed the following acts, which subjects him to the jurisdiction of this Court: (i) meeting with Muntasser in person in Massachusetts to solicit Muntasser to invest in a SIG-affiliated entity and making knowingly false statements as part of Defendants' affirmative solicitation of Muntasser in Massachusetts; (ii) corresponding via Zoom, email, and phone with Muntasser as part of the solicitation and negotiation process  related to Muntasser's investment, knowing that Muntasser was in Massachusetts; (iii) knowingly creating falsified monthly financial statements and transmitting them to Muntasser, knowing he would receive them in Massachusetts; (iv) causing wire transfers to be transmitted to Muntasser, knowing he resided in Massachusetts; and (v) specifically targeting other U.S.-based investors in Massachusetts and elsewhere, including inviting approximately 20 potential investors from New England to meetings in Massachusetts.

24.     Among other things, Hitto committed the following acts, which subjects him to the jurisdiction of this Court: (i) meeting with Muntasser in person in Massachusetts to solicit Muntasser to invest in a SIG-affiliated entity and making knowingly false statements as part of Defendants' affirmative solicitation of Muntasser in Massachusetts; (ii) corresponding via Zoom, email, and phone with Muntasser as part of the solicitation and negotiation process related to

Muntasser's investment, knowing that Muntasser was in Massachusetts; (iii) meeting with Muntasser and another Massachusetts-based investor in person at a restaurant on the South Shore of Massachusetts in May 2024 to discuss Muntasser's investment in İNCE Gold; (iv) causing wire transfers to be transmitted to Muntasser, knowing he resided in Massachusetts; and (v) specifically targeting other U.S.-based investors in Massachusetts and elsewhere, including inviting approximately 20 potential investors from New England to meetings in Massachusetts.

## Factual Background

### *SIG Solicits Mr. Muntasser for an Investment: June 2021 to August 2021.*

25.     In June 2021, Muntasser was introduced to SIG through Yousef Abou-Allaban ("Yousef")—a friend and mutual investor—at Yousef's home in Mansfield, Massachusetts (the "June Meeting").

26.     At the start of the June Meeting, Hitto and Tabbara introduced themselves as executives and investors with SIG. Hitto and Tabbara made a presentation showcasing a series of projects and investment opportunities with SIG, including the İNCE brand of companies, which they said engaged in money transfer and exchange and precious metals trading throughout Turkey. They also presented other investment opportunities in the real estate development and hotel sectors. Mustafa and Mahmoud knew about Hitto and Tabbara's planned solicitation and presentation before the June Meeting in Massachusetts and approved of the representations that Hitto and Tabbara made during the June Meeting.

27.     At the time of the June Meeting, unbeknownst to Muntasser, Hitto and Tabbara were not registered broker-dealers with the Securities and Exchange Commission or any other state or self-regulatory body, and they were not authorized to sell securities in private offerings.

28.     Following the June Meeting, Muntasser exchanged a series of emails and text messages with Hitto and Tabbara regarding the opportunities they offered through SIG.  Mustafa and Mahmoud were included in nearly all relevant and material written messages with Muntasser, and they also participated in multiple video conferences with him.  At all relevant times, Defendants knew Muntasser was in Massachusetts for each of these communications.

29.     On June 25, 2021, based on the statements Hitto and Tabbara made during the presentation about the potential investment and Defendants' background in general, Muntasser emailed Hitto that he was interested in learning more about the İNCE brand of companies and land investment opportunities presented at the June Meeting.

30.     On July 1, 2021—following a Zoom call between Muntasser and Hitto—Tabbara sent an email to Muntasser and copied Hitto, Mustafa, and Mahmoud.  This July 1, 2021, email contained a fact sheet for two investment opportunities – one for a real estate investment and another for a company called İNCE, described as a money transfer and exchange business with formal licensures from the Turkish Ministry of Treasury.  A copy of the email and fact sheets are attached as **Exhibit 1**.  The İNCE fact sheet stated, *inter alia*, the following:

   a.   İNCE consists of a group of companies in Turkey under the İNCE brand that are engaged in currency exchange, precious metal trading, and money transfer;

   b.   İNCE is "**Fully licensed** by the Turkish **Ministry of Treasury**" (emphasis in original);

   c.   "İnce, is one of 18 financial institutions with a **Class A license** in all of Turkey" (emphasis in original);

   d.   İNCE operates multiple branches, primarily in high tourist traffic areas, to capture a very high frequency in daily transactions;

e.  The money transfer model relies on a large, trusted network covering western Europe, North Africa, the Middle East, and Asia;

f.  Projected investment returns are 15%; and

g.  "[An] investor can stop investment and **receive 100%** of invested amount **within 4 weeks**." (emphasis in original).

31.  As Defendants knew, but unbeknownst to Muntasser, all the above statements on the İNCE fact sheet were false and were made for the purpose of inducing Muntasser and others to invest with Defendants.

32.  Based on the statements contained in the fact sheet, as well as Defendants' statements made during the June Meeting, Muntasser believed the investment opportunities that Defendants offered were attractive.

33.  On July 29, 2021, while conducting due diligence related to the İNCE offering, Muntasser asked: "Would the money raised for the cash exchange be used to subsidize the opening of more locations or used directly in the money exchange as available cash to clients/transactions?"  Tabbara replied, "No.  The money raised will be strictly used for the transactional purposes explicitly expressed to you, i.e. cash exchange, as you put it.  None of the money raised will be used for any other purpose."  Mustafa, Hitto, and Mahmoud were copied on the exchange, which is attached hereto as **Exhibit 2**.  As Defendants knew at the time, Tabbara's statement was false.  Indeed, as Muntasser later learned, İNCE Gold was never licensed to conduct currency exchange and transfers, and it never held the required Class A license with the Turkish Ministry of Treasury.  Mustafa and Mahmoud endorsed Hitto's misrepresentations by failing to correct or amend them.

11

34.     Based on Defendants' false representations that Muntasser's funds would be used solely to support one of İNCE's money transfer and exchange units, Muntasser decided to invest with Defendants.  Thereafter, the parties negotiated the terms of a Non-Equity Working Capital Investment Agreement.  This negotiation process included several Zoom conferences and email communications between Muntasser and Mustafa, Tabbara, Hitto, and Mahmoud.  The Defendants knew that Muntasser was in Massachusetts during all these communications.

<u>*The Negotiation Phase: August 2021 to December 2021.*</u>

35.     On August 15, 2021, Tabbara emailed Muntasser a draft investment contract identifying the İNCE party as "İNCE Group, a group of companies established in Istanbul, Turkey and providing financial services including currency exchange, precious metal trading and money transfer," and reciting that "İnce will only use the Working Capital exclusively for the purpose of money transfer transactions."  Mustafa, Mahmoud, and Hitto were copied on this and most other material correspondence.  Though this version was not the final agreement between the parties, the Defendants falsely represented in ***all*** versions that Muntasser's working capital investment would be used exclusively for the İNCE money transfer and exchange business.  This was a material term upon which Muntasser expressly relied to make his investments with Defendants.

36.     On September 27, 2021, Defendants provided Muntasser with another draft of an investment agreement for funds exclusively to be used for money transfer transactions.  But this time, the İNCE entity listed included: "INCE TRANSFER DIS TICARET ANONIM SIRKETI, a joint stock company registered in Turkey under registration number 27688, located at Mesihpasa Mahallesi Ordu Cad. Sanli Is Merkezi Apt. No:91/40, Fatih, Istanbul, Turkey."

37.     In the next iteration, the company listed as the İNCE counterparty was İNCE DÖVİZ VE ALTIN TİCARETİ YETKİLİ MÜESSESE ANONİM ŞİRKETİ ("İNCE Doviz").

38.     On October 13, 2021, Muntasser's attorney wrote to Tabbara and requested additional information related to various legal and compliance matters, specifically the registration and accounting practices that would be applied to ensure that Muntasser's investment would comply with Turkish law.  Two days later, Tabbara replied: "Let me take this opportunity to emphasize that all related transactions will be declared and official as that has been our mode of doing business consistently."  Muntasser later learned that these statements were false.  Upon information and belief, Mustafa authorized this misrepresentation for the purpose of inducing Muntasser to make an investment.

39.     From late September through December 2021, the parties discussed other potential investments in the hotel and real estate sectors, including a residential development in Izmir, Turkey, which Defendants pitched as being part of a re-zoning initiative to support new construction of multi-unit residential properties.  Muntasser decided not to make those investments after determining that he only wanted to invest in the money transfer business.

40.     On December 23, 2021, Tabbara sent a final and executed version of a Nonequity Working Capital Investment Agreement, which for the first time listed İNCE Gold as "a joint stock company registered in Turkey under registration number 94323-5, located at Meshipasa Mahallesi Ordu CadNo:91 A Faith Istanbul Turkey."  Tabbara sent the agreement via email and copied Mustafa, Hitto, and Hitto.  The executed agreement ("December Agreement," attached hereto as **Exhibit 3**) memorialized Muntasser's $1 million investment in İNCE Gold.  The December Agreement also listed Muntasser's home address in Massachusetts.  Mustafa signed the December Agreement on behalf of İNCE Gold.

41.     The December Agreement provided, *inter alia*:

    a.   The funds invested constituted a "nonequity working capital investment with periodic distributions";

    b.   "Investor and Ince will share the profit generated by the Working Capital after the payment of all expenses incurred as a result of running the Working capital";

    c.   "Ince will only use the Working Capital exclusively for the purpose of money exchange transactions";

    d.   Muntasser would receive 53% of net profits on a monthly basis, which Muntasser could elect to be distributed or rolled over;

    e.   "Ince shall return the full amount of the Working Capital to [Muntasser] within 30 (Thirty) days written notice by [Muntasser]";

    f.   İNCE would default (i) if it failed to pay any amount due, (ii) if any representation or statement by İNCE in "any notice or other document, certificate or statement delivered by Ince in a document or in connection therewith is or proves to have been incorrect or misleading is any material respect . . . is not remedied within five (5) days," or (iii) if it failed to perform its obligations, and "the authority of Ince in the conduct of its business is wholly or partially curtailed";

    g.   İNCE owes a fiduciary duty to Muntasser "[t]o practice good judgment for the safekeeping and use of Working Capital whether or not in Ince's immediate possession or control"; and

    h.   The parties would abide by applicable money laundering and anti-terrorism laws, "including without limitation the Bank Secrecy Act, the USA Patriot Act."

14

42.     As Defendants knew, but unbeknownst to Muntasser, all the above statements in the December Agreement were false and were made to induce Muntasser to make his initial $1 million investment.

43.     Based on those fraudulent misrepresentations, on or about December 29, 2021, Muntasser wired $1 million of his own funds from his U.S. bank account to İNCE Gold.

*Based on Defendants' Repeated and Continuing Knowing Misrepresentations, Muntasser Increases his Investment in İNCE Gold to $2 Million in February 2022, and by an additional $2 Million in March 2022.*

44.     After Muntasser made his initial $1 million investment, Defendants continued to reach into Massachusetts and solicit him with the hope that he would make additional investments with them.

45.     On February 1, 2022, Tabbara sent Muntasser an email (copying Mustafa, Mahmoud, and Hitto) containing the first financial statement concerning Muntasser's initial investment of $1 million, which purported to show a net profit of $11,959.45.

46.     On February 8, 2022, based on the purported success of Muntasser's investment, as reflected on the financial statements Defendants sent to him, Muntasser decided to increase his investment with Defendants by $1 million.  On that date, he executed a nearly identical version of the December Agreement with İNCE Gold ("the February Agreement").  Shortly thereafter, Muntasser wired $1 million from his U.S. bank account to Defendants.  A copy of the email and executed copy of the February Agreement, which Mustafa signed on behalf of İNCE Gold, are attached hereto as **Exhibit 4**.

47.     On February 17, 2022, Tabbara emailed a certificate signed by Mustafa acknowledging Muntasser's December and February investments.  A copy of the email and signed certificates are attached hereto as **Exhibit 5**.

48.     By that point, Muntasser had invested a total of $2 million with Defendants.

49.     After February 2022, Tabbara continued to send Muntasser, in Massachusetts, monthly financial statements, in which Defendants knowingly misstated the profits that Muntasser's investment had purportedly generated. Mustafa, Hitto, and Mahmoud were copied on all email messages transmitting these false financial statements.

50.     In late February and into March 2022, Mustafa, Hitto, and Tabbara continued to discuss with Muntasser certain investment opportunities in a series of land, real estate, fertilizer, and hotel offerings. Mahmoud was copied on email correspondence and participated in most of the related video and telephone conferences.

51.     On March 2, 2022, Hitto sent a message to Muntasser and copied Mustafa, Mahmoud, and Tabbara. The email described seven ventures where Muntasser made or could make an investment through SIG. Follow up discussions consisted of emails, video conferences, and WhatsApp conversations, both verbally and in writing. Muntasser viewed most of these investments as too risky, and instead considered the İNCE Gold offering as a better option.

52.     Defendants' continuing solicitations were efforts to support their criminal scheme, which requires the influx of money from new investors to settle with old investors (often at a loss to the unwitting investors).

53.     On March 12, 2022, Muntasser reached out directly to Mustafa, proposing that he increase his profit share in İNCE in exchange for an additional $1.5 million investment. Attached hereto as **Exhibit 6** is a copy of that email. On March 15, 2022, Mustafa declined Muntasser's offer of an increased profit share. In doing so, Mustafa confirmed in writing his direct and controlling role with respect to the December Agreement and the February Agreement, stating:

16

"As you know, we have arrived at the current profit sharing scheme between us *after many rounds of discussions that started with different amount*. At the time, we agreed upon the current percentages as an exception made specifically to you because of our earnest interest to do a lot more business together moving forward. As such, I do believe that we have a fair deal and I obviously welcome any additional amounts you'd like to invest with us." (emphasis added).

54.     In March 2022, based on Defendants' false statements, including but not limited to their statements concerning the increase in value of his initial investments, Muntasser decided to increase his investment with Defendants by $2 million.  Before doing so, Muntasser specifically requested confirmation that İNCE and "its related investments and sister companies are operating normally and that there are no incidents of loss or theft or any negative financial performance or pending investigation or legal action. . . ."  Tabbara replied by copying and pasting Muntasser's requested confirmation and adding , "[t]his is to confirm the above is true, and that there were no incidents outside of Tahan has been expected which have been part of the general risk explained to you before, and assumed by ince."  Tabbara and the other Defendants knew this statement was false at the time it was made.

55.     On or about March 25, 2022, based on Tabbara's affirmative false statements, Muntasser signed a contract memorializing his final investment in İNCE Gold for $2 million ("the March Agreement").  Shortly thereafter, Muntasser wired $2 million from his U.S. bank account and received a signed certificate from Mustafa.  Attached hereto as **Exhibit 7** is a copy of the March 21-25, 2022, email exchange and the March Agreement.

56.     At that point, Muntasser had invested $4 million with Defendants, which was supposed to be used only to support a cash exchange and money transfer business.  As Muntasser later learned, all of this was a lie, and Defendants were using İNCE Gold for a series of illicit purposes.

17

*Muntasser Receives Two Sham Profit Distributions*
*in May 2023 and January 2024.*

57.     On March 4, 2023 (approximately one year after investing his entire $4 million of life savings with Defendants), Muntasser sent an email to Mustafa, Mahmoud, Tabbara, and Hitto to request a withdrawal of all accumulated *profits* by the end of April 2023.  In response, Tabbara stated Defendants would process Muntasser's request.  Attached hereto as **Exhibit 8** is a copy of the message (copying Mustafa, Mahmoud, and Hitto).

58.     On April 28, 2023, Tabbara provided Muntasser with a swift bank transfer document that listed the amount of purported accrued profits and stated, "we will share the most up to date statement on the investment at the beginning of May."  Attached hereto as **Exhibit 9** is a copy of the message (copying Mustafa, Mahmoud, and Hitto).

59.     On May 1, 2023, İNCE Gold distributed $492,422 in purported profits to Muntasser.

60.     The written wire instruction that accompanied the distribution falsely stated, in Turkish, that the transfer constituted a "refund of incoming payment."  Muntasser does not speak or read Turkish and therefore did not understand the false statement in the wire instruction. Defendants secretly included this false description as a pretext so that Mustafa could later falsely claim that the agreed-upon distribution of profits was actually a return of principal.

61.     On August 3, 2023, Tabbara sent a July 2023 investment statement to Muntasser and wrote, "[t]o avoid any delays on issuing the monthly reports, Mahmoud Sabbagh will be sharing these reports from this point forwards."

62.     Unbeknownst to Muntasser, this would be the final email that Tabbara sent in any capacity related to Muntasser's investment with İNCE Gold or SIG.

18

63.    Tabbara's August 3, 2023, email was intended to provide a cover story as he and Hitto slowly started to withdraw themselves from SIG in late 2023 when it became clear that the fraud scheme related to various SIG enterprises would be exposed.

64.    On December 1, 2023, Muntasser requested a withdrawal of his accumulated 2023 *profits* in İNCE Gold via email to Mustafa and Mahmoud.  In that same month, Mustafa fraudulently transferred all İNCE Gold shares to an individual named Mohammed Mulla.

65.    On January 23, 2024, Mustafa emailed Muntasser and wrote, "Please find here under below a copy of the T/T swift of the amount of USD 445.863,00 dated today 23 January 2024."  The subject line of the email read "INCE Wire Transfer" and is attached hereto as **Exhibit 10**.

66.    Consistent with the distribution of profits in May 2023, Mustafa misrepresented, in Turkish, that the wire transfer constituted the "return of capital received in 28 March 2022" (the date of Muntasser's third and final investment with Defendants).  Mustafa made this false representation as a pretext so that Mustafa could later falsely claim that the agreed-upon distribution of profits was actually a return of principal.

### *Mustafa Attempts to Convince Muntasser to Make Additional Investments; The Fraudulent Scheme Unravels between January 2024 and April 2024.*

67.    In January 2024, Mustafa repeatedly attempted to convince Muntasser to invest $10 million in a hotel business, which Muntasser declined.  Mustafa alternatively pressed Muntasser to invest in a short-term $7.5 million financing deal.  Muntasser again declined.  Mustafa finally asked Mr. Muntasser to make a $1 million investment.  Once again, Muntasser declined.  Muntasser later learned that these repeated solicitations were an effort by Mustafa to finance a failing hotel enterprise.  Upon information and belief, at the time Mustafa made these

repeated misrepresentations, he had already misappropriated Muntasser's investment towards that failed hotel enterprise without Muntasser's knowledge or consent.

68.     On February 15, 2024, Muntasser requested a return of $2 million of his $4 million principal investment in İNCE within 30 days, which was consistent with the terms of the parties' investment contracts.

69.     On February 22, 2024, Mustafa requested Muntasser accept the return of the $2 million in two deferred installments: $1 million by April 10, 2024, and $1 million by May 10, 2024.  Muntasser agreed, on the condition that his investment would continue to accrue profits through those dates.

70.     On April 4, 2024, Mustafa told Muntasser via telephone that a buyer in connection with a Menemen land deal failed to make follow up payments, and that there was a situation with his İNCE Gold funds.  They agreed to speak the next day.

71.     On April 5, 2024, Mustafa told Muntasser that a rogue SIG manager and employee stole Muntasser's investment by emptying an İNCE Gold safe containing physical gold and cash and absconding without a trace.  Mustafa claimed to be deeply upset and told Muntasser that he mentored this individual with the ambition that he would become a leader with SIG, and that he had even granted the manager full power of attorney to conduct extensive business affairs on behalf of SIG.  Mustafa also claimed this individual transferred land from SIG to himself and implied that he sold it to a third party.

72.     When pressed about a police report or involvement of law enforcement, Mustafa claimed he did not report the theft because some of SIG's conduct was "not official" – Middle Eastern parlance for illegal – and reporting the theft might cause Muntasser to get "mixed up" with İNCE's activities.  Muntasser told Mustafa he paid taxes and reported all transactions to

relevant tax authorities in the United States, and he demanded that Mustafa file a police report and pursue necessary legal action.  Mustafa refused.

73.     Muntasser also asked how a single person could gain access to a safe to steal that amount of gold and cash, and why the money was simply sitting in a safe rather than being used as Mustafa had told Muntasser it would be.  Mustafa stated he could not discuss the matter over the phone but said that the manager converted Muntasser's investment to gold.  In addition, on that call, Mustafa promised to try to get *some* of the money back for İNCE Gold, but Muntasser would need "to forgive the rest" for an unspecified amount.  At the same time, Mustafa indicated he might file for bankruptcy and prevent collection.

74.     Mustafa also claimed that despite the elaborate theft, other investors remained committed to working with SIG in the future.  Finally, Mustafa also stated that only Muntasser and one other investor could cause "trouble" for him.

75.     As Muntasser later learned, all the representations regarding the theft of Muntasser' investment were lies concocted to coerce and extort Muntasser into accepting a loss on his investments, which Defendants had misappropriated for unrelated businesses and personal expenditures.

76.     Mustafa further violated the Anti-Money Laundering and Anti-Terrorism clause of the investment contracts when an individual on a terrorist watch list conducted a transaction with İNCE Gold, resulting in the arrest of one or more employees.

77.     Around this same time, Muntasser learned that İNCE Gold does not even have a license to conduct money transfers and exchanges.

78.     At various times after the call on April 5, 2024, Mustafa has used the risk of impairing the Syrian Forum to impose pressure on Muntasser not to report Defendants' illegal conduct.

79.     In early May 2024, Muntasser reached out to Tabbara and Hitto to raise concerns about the situation with his İNCE Gold investment.  For the first time, Tabbara and Hitto told Muntasser they resigned from SIG in late 2023 under dubious circumstances.  Both claimed they lost substantial sums of money investing with Mustafa and his suite of SIG-related entities.

80.     Later in May 2024, Muntasser met with Hitto and Yousef at a restaurant on the South Shore of Massachusetts to discuss Muntasser's investment with Defendants.  Hitto falsely claimed that Mustafa concealed material facts from him as well.  According to Hitto, he and Tabbara simply acted as secretaries, passing information to Muntasser that Mustafa and Mahmoud had developed.  Hitto falsely denied creating falsified monthly statements.

81.     Hitto's denial of involvement is a sham.  Upon information and belief, Hitto and Tabbara both earned substantial sums of money from their involvement with SIG and did not suffer any losses.

82.     Mustafa has falsely claimed that the distribution of Muntasser's profits associated with his investment in İNCE Gold constituted a return of capital.

83.     Defendants' fraud scheme continues unabated.  U.S.-based investors unaware of the underlying fraudulent conduct have continued to receive fabricated profit statements from İNCE Gold and SIG, despite Mustafa's claim that a company insider stole all of İNCE Gold's gold and cash.

## COUNT I – Conspiracy
**(Against All Defendants)**

84.     Plaintiff hereby incorporates by reference the allegations made in paragraphs 1–83.

85.     Defendants agreed to engage in a common plan to work together to fraudulently induce their victims, including Muntasser, into investing money with Defendants under false pretenses.

86.     This common plan also involved Defendants' misappropriating investor funds for businesses unrelated to the stated purpose of the investments, as well as for Defendants' personal expenses.

87.     The affirmative acts that Defendants carried out in furtherance of their conspiracy included, but are not limited to:

a.   Tabbara and Hitto, with the knowledge and assistance of Mustafa and Mahmoud, made a presentation on behalf of SIG and its affiliates to Muntasser and other prospective investors at the June Meeting in Mansfield, Massachusetts;

b.   Defendants misrepresented to Muntasser that his investment would be used exclusively for a cash exchange and money transfer business;

c.   Defendants participated in a series of Zoom and conference calls to pitch the SIG offering to Muntasser following the June Meeting;

d.   Mustafa executed the December Agreement, February Agreement, and March Agreement with no intent by any of the Defendants to perform those agreements;

e.   Defendants used Muntasser's investment to support other ventures, to pay off old investors, and to support their lavish lifestyles;

    f.   Defendants created falsified financial statements, and then disseminated those to Muntasser via email;

    g.   Mustafa tried to coerce and extort Muntasser not to reveal Defendants' fraud once detected; and

    h.   Hitto misrepresented that he and Tabbara did not know about the fraud.

88.    Muntasser suffered harm as a result of Defendants' conspiracy to defraud him.

**COUNT II – Common Law Fraud/Misrepresentation**
**(Against All Defendants)**

89.    Plaintiff hereby incorporates by reference the allegations made in paragraphs 1–88.

90.    As set forth above, Defendants knowingly made repeated false statements of material fact to Muntasser related to, *inter alia*, the operations of İNCE Gold, the legality of İNCE Gold's activities, and the manner in which Muntasser's invested funds would be used.

91.    Defendants knew that their statements of fact were false when made.

92.    Defendants knew that their false statements of fact were material to Muntasser's decision to invest money with the Defendants.

93.    Defendants intended that Muntasser would rely on their false statements of fact and invest money with them.

94.    Muntasser reasonably relied on Defendants' knowingly false statements, believing that Defendants were trustworthy, in part because of their prominent political and philanthropic leadership roles.  Muntasser believed Defendants' statements of fact were true.

95.    As a result of Muntasser's reasonable reliance on Defendants' fraudulent misrepresentations, Muntasser suffered harm.

**COUNT III – Aiding and Abetting Common Law Fraud**
**(Against Mahmoud Sabbagh, Ghassan Hitto, M. Yaser Tabbara, SIG, and İNCE Gold)**

96.     Plaintiff hereby incorporates by reference the allegations made in paragraphs 1–95.

97.     Mustafa committed fraud through the acts and omissions detailed above.

98.     Defendants Mahmoud, Hitto, and Tabbara had actual knowledge of Mustafa's fraud.

99.     Defendants Mustafa, Mahmoud, Tabbara, and Hitto associated with SIG and İNCE Gold as owners, employees, and/or consultants at varying relevant times to solicit U.S.-based investors under false pretenses in connection with a scheme to defraud Muntasser and others.

100.     SIG and İNCE Gold are distinct enterprises from Mustafa, Mahmoud, Tabbara, and Hitto.

101.     Defendants Mahmoud, Hitto, Tabara, SIG, and İNCE Gold knowingly participated in and provided substantial assistance to Mustafa in the commission and concealment of his tort.

102.     Muntasser suffered harm as a result of Mahmoud, Hitto, Tabara, SIG, and İNCE Gold's conduct of aiding and abetting Mustafa's fraud.

**COUNT IV – Negligent Fraud/Misrepresentation**
**(Against Ghassan Hitto, M. Yaser Tabbara, SIG, and İNCE Gold)**

103.     Plaintiff hereby incorporates by reference the allegations made in paragraphs 1–102.

104.     As set forth above, Tabbara and Hitto made repeated false statements of material fact to Muntasser.

105.    Tabbara and Hitto should have known their statements were false with the exercise of reasonable care.

106.    Tabbara and Hitto's negligent misrepresentations were material to Muntasser's decision to invest money with Defendants.

107.    Tabbara and Hitto intended that Muntasser would rely on their false statements of fact and invest money with Defendants.

108.    Muntasser reasonably relied on Tabbara and Hitto's negligently false statements, which he believed to be true.

109.    Defendants Tabbara and Hitto associated with SIG and İNCE Gold as owners, employees, and/or consultants at varying relevant times to solicit U.S.-based investors under false pretenses in connection with a scheme to defraud Muntasser and others.

110.    SIG and İNCE Gold are distinct enterprises from Tabbara, and Hitto.

111.    As a result of his reasonable reliance, Muntasser suffered harm from Defendant's false statements.

### COUNT V – Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Thereunder
#### (Against All Defendants)

112.    Plaintiff hereby incorporates by reference the allegations made in paragraphs 1–111.

113.    Tabbara and Hitto made a series of material misrepresentations and related omissions regarding the İNCE Gold offering in coordination with Mustafa and Mahmoud, including but not limited to the following:

    a.    Falsely representing that İNCE and İNCE Gold held a Class A license with the Turkish Ministry of Finance;

b. Falsely representing that Muntasser's investment would be used strictly in connection with supporting İNCE Gold's money exchange and transfer business;

c. Presenting falsified monthly financial statements showing profit growth in connection with the İNCE Gold investment;

d. Misappropriating Mr. Muntasser's investment to purchase gold, and then falsely representing that it was stolen by a company insider; and

e. Operating shell companies to perpetuate the fraudulent scheme.

114. The above-mentioned false statements and omissions were part of a conspiracy coordinated by Mustafa, whereby Tabbara and Hitto solicited investments on behalf of SIG and İNCE Gold.

115. Defendants Mustafa, Mahmoud, Tabbara, and Hitto associated with SIG and İNCE Gold as owners, employees, and/or consultants at varying relevant times to solicit U.S.-based investors under false pretenses in connection with a scheme to defraud Muntasser and others.

116. SIG and İNCE Gold are distinct enterprises from Mustafa, Mahmoud, Tabbara, and Hitto.

117. Muntasser considered Defendants' representations as important and material to his evaluation of the İNCE Gold offering and to his decision to make a $4 million investment.

118. Muntasser specifically relied upon these representations in making his investment decision. As a direct result of Defendants' material misrepresentations and omissions, Muntasser made a $4 million investment in İNCE Gold.

119. Muntasser's reliance was justifiable, including because Defendants' prominent political and philanthropic leadership roles created the impression that they were trustworthy.

120.     The İNCE Gold offering constitutes a security.

121.     Defendants had no present intent to conduct lawful investments with Mr. Muntasser $4 million.  Defendants instead intended to use (and ultimately did use) Mr. Muntasser's investment for a series of illicit purposes, including to support Defendants' lavish lifestyles and other SIG ventures that were separate and apart from the stated purpose of Muntasser's investment.

122.     As a direct result of Defendants' misrepresentations and omissions regarding İNCE Gold, Mr. Muntasser suffered harm.

## COUNT VI – Violation of G. L. c. 110A § 410 (Civil Liabilities)
### (Against All Defendants)

123.     Plaintiff hereby incorporates by reference the allegations made in paragraphs 1–122.

124.     The Massachusetts Uniform Securities Act ("the Act"), G. L. c. 110A § 410, provides a comprehensive framework for the offer, sale, or purchase of securities in the Commonwealth of Massachusetts.

125.     Section 410 provides a cause of action allowing rescissory damages and attorneys' fees against any person who, *inter alia*, (i) transacts business as an unregistered broker-dealer or agent; (ii) offers or sells a security, unless an exemption applies; (iii) offers or sells a security by any untrue statement of material fact or omission; or (iv) controls directly or indirectly any seller liable for the aforementioned bases.  *See* G. L. c. 110A § 410(a)–(b).  All Defendants are liable for one or more bases provided under § 410.

126.     Tabbara and Hitto made a series of material misrepresentations and related omissions regarding the İNCE Gold offering in coordination with Mustafa and Mahmoud, including but not limited to the following:

28

    a. Falsely representing that İNCE and İNCE Gold held a Class A license with the Turkish Ministry of Finance;

    b. Falsely representing that Muntasser's investment would be used strictly in connection with supporting İNCE Gold's money exchange and transfer business;

    c. Presenting falsified monthly financial statements showing profit growth in connection with the İNCE Gold investment;

    d. Misappropriating Mr. Muntasser's investment to purchase gold, and then falsely representing that it was stolen by a company insider; and

    e. Operating shell companies to perpetuate the fraudulent scheme.

127. The above-mentioned false statements and omissions were part of a conspiracy coordinated by Mustafa, whereby Tabbara and Hitto solicited investments on behalf of SIG and İNCE Gold.

128. At all relevant times, Mustafa and Mahmoud controlled and directed Tabbara and Hitto's actions, including by approving the suite of investment opportunities available with SIG, and by approving the representations regarding how Muntasser's investment would be used.

129. Defendants Mustafa, Mahmoud, Tabbara, and Hitto associated with SIG and İNCE Gold as owners, employees, and/or consultants at varying relevant times to solicit U.S.-based investors under false pretenses in connection with a scheme to defraud Muntasser and others.

130. SIG and İNCE Gold are distinct enterprises from Mustafa, Mahmoud, Tabbara, and Hitto.

131. All Defendants knew, or in the exercise of reasonable care, should have known, (a) of the falsity of their representations to Muntasser, and (b) of the omission of material facts.

132.     Muntasser considered Defendants' representations as important and material to his evaluation of the İNCE Gold offering and his decision to make a $4 million investment.

133.     Muntasser specifically relied upon these representations in making his investment decision.

134.     Muntasser was not aware of the falsity of Defendants' representations, nor was he aware of their material omissions.

135.     As a direct result of Defendants' material misrepresentations and omissions, Muntasser made a $4 million investment in İNCE Gold.

136.     The İNCE Gold offering constitutes a security.

137.     The offer and sale of İNCE Gold occurred in Massachusetts, where Muntasser was located at all relevant times.

138.     Defendants had no present intent to conduct lawful investments with Mr. Muntasser $4 million.  Defendants instead intended to use (and ultimately did use) Mr. Muntasser's investment for a series of illicit purposes, including to supporting Defendants' lavish lifestyles and other SIG ventures that were separate and apart from the stated purpose of Muntasser's investment.

139.     As a direct result of Defendants' misrepresentations and omissions regarding İNCE Gold, Mr. Muntasser suffered harm.

**COUNT VII – Violation of Section 20(a) of the
Securities Exchange Act of 1934 ("Control Person Liability")
(Against Mustafa Sabbagh, Mahmoud Sabbagh, SIG, and İNCE Gold)**

140.     Plaintiff hereby incorporates by reference the allegations made in paragraphs 1– 139.

141.    Section 20(a) of the Securities Exchange Act of 1934 provides that "controlling persons" can be vicariously liable for 10b-5 violations.

142.    Tabbara and Hitto represented themselves to be senior executives with SIG who were raising money on behalf of a series of investment opportunities with SIG.

143.    Tabbara and Hitto, through their various fraudulent statements, violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.

144.    At all relevant times, Mustafa, Mahmoud, SIG, and İNCE Gold controlled and directed Tabbara and Hitto's actions, including by approving the suite of investment opportunities available with SIG, and by approving the representations regarding how Muntasser's investment would be used.

145.    Further, Mustafa, Mahmoud, SIG, and İNCE Gold were also culpably and directly involved in Tabbara and Hitto's violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, including by (a) approving of the fraudulent representations they were making to Muntasser about his investment, and (b) actively managing and benefiting from the fraudulent affinity scam that was concealed by Defendants' misstatements and omissions.

146.    At all relevant times, Mustafa, Mahmoud, SIG, and İNCE Gold were aware of, and consciously intended to aid, Tabbara and Hitto's violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.

147.    Muntasser reasonably relied on the information he received from Defendants in deciding to invest $4 million into İNCE Gold.

148.    Muntasser suffered harm as a result of his reasonable reliance on Defendants' material misrepresentations and omissions related to İNCE Gold.

## COUNT VIII – Violation of Section 29(b) of the Securities Exchange Act of 1934
### ("Validity of Contracts")
### (Against SIG and İNCE Gold)

149.    Plaintiff hereby incorporates by reference the allegations made in paragraphs 1–148.

150.    Section 29(b) of the Exchange Act of 1934, 15 U.S.C. § 78cc(b), provides that any investment contract is voidable when entered into in violation of the Exchange Act or any other securities laws, rules, or regulations.

151.    The İNCE Gold offering constitutes a security.

152.    Muntasser is in privity of contract with İNCE Gold, which is an affiliate of SIG.

153.    Muntasser is amongst the class of people that the Exchange Act of 1934 is designed to protect.

154.    The İNCE Gold offering violated the Exchange Act of 1934 because, *inter alia*, (i) Defendants violated Rule 10b-5, and (ii) Tabbara and Hitto solicitated and sold the İNCE Gold offering as unregistered brokers.

155.    Because of these prohibited acts, the December Agreement, February Agreement, and March Agreement are voidable under 15 U.S.C. § 78cc(b).

156.    As a direct result of Defendants' prohibited acts, Muntasser entered into three investment contracts with İNCE Gold for $4 million (the December Agreement, February Agreement, and March Agreement).

157.    Muntasser is entitled to void the İNCE Gold contracts and secure a return of his investment principal in the amount of $4 million.

## COUNT IX – Violation of the Federal Racketeering Act (18 U.S.C. § 1962)
### (Against All Defendants)

158.    Plaintiff hereby incorporates by reference the allegations made in paragraphs 1–157.

159.    Defendants all received income and used money generated from their activities in connection with SIG and İNCE Gold.

160.    Mustafa, Mahmoud, Tabbara, and Hitto associated with SIG and İNCE Gold as owners, employees, and/or consultants at varying relevant times to solicit U.S.-based investors under false pretenses in connection with a scheme to defraud Muntasser and others.

161.    SIG and İNCE Gold are distinct enterprises from Mustafa, Mahmoud, Tabbara, and Hitto.

162.    Defendants' scheme to defraud involved convincing Muntasser to enter into three illegal investment contracts under the false pretense of a legitimate investment.

163.    As a consequence, Muntasser transmitted $4 million to Defendants' control through interstate commerce on or about December 23, 2021; February 8, 2022; and March 25, 2022.

164.    Each transfer of money by Muntasser to İNCE Gold represents a separate independent violation of 18 U.S.C. § 1343 (Wire Fraud), which together amount to a pattern of racketeering.

165.    As a direct result of Defendants' pattern of racketeering, Muntasser suffered harm.

## COUNT X – Breach of Contract
### (Against İNCE Gold)

166.   Plaintiff hereby incorporates by reference the allegations made in paragraphs 1–165.

167.   Muntasser entered into valid, enforceable agreements with İNCE Gold, including the December Agreement, February Agreement, and March Agreement.

168.   Muntasser performed fully under those agreements by transferring $4 million to İNCE Gold.

169.   İNCE Gold materially breached each one of those agreements, including by failing to follow applicable law, by failing to use Muntasser's investment solely for money transfer and currency exchange operations, and by failing to return Muntasser's investment principal when requested.

170.   Muntasser was harmed because of İNCE Gold's breaches.

## COUNT XI – Breach of Fiduciary Duty
### (Against Mustafa Sabbagh, Mahmoud Sabbagh, Ghassan Hitto, M. Yaser Tabbara, and İNCE Gold)

171.   Plaintiff hereby incorporates by reference the allegations made in paragraphs 1–170.

172.   Defendants owed a fiduciary duty to Muntasser.

173.   Defendants Mustafa, Mahmoud, Tabbara, Hitto, and İNCE Gold owed Muntasser a fiduciary duty under principles of common law and contract.

174.   Defendants Mustafa, Mahmoud, Tabbara, Hitto, and İNCE Gold breached their fiduciary duty to Muntasser through the following non-exhaustive acts and omissions:

   a.   Failing to use Muntasser's investment with İNCE Gold in connection with a cash exchange and money transfer business;

34

     b.   Converting Muntasser's investment for personal use and/or failing to have adequate controls in place to prevent conversion of Muntasser's investment;

     c.   Presenting false financial statements showing profit growth in connection with Muntasser's İNCE Gold investment; and

     d.   Failing to return Muntasser's investment principal.

175.    As a direct consequence of these breaches, Muntasser has suffered harm.

## COUNT XII – Conversion
### (Against All Defendants)

176.    Plaintiff hereby incorporates by reference the allegations made in paragraphs 1–175.

177.    Through their fraudulent statements, Defendants intentionally and wrongfully exercised control and dominion over Muntasser's investment of $4 million.

178.    Muntasser had an ownership or possessory interest in the property at the time Defendants converted it.

179.    Muntasser requested that his investment be returned, and Defendants refused.

180.    Defendants' wrongful actions were the legal cause of Muntasser's loss of the property.

## COUNT XIII – Violation of G. L. c. 93A
### (Against All Defendants)

181.    Plaintiff hereby incorporates by reference the allegations made in paragraphs 1–180.

182.    Defendants are engaged in trade and commerce.

183.    Defendants engaged in unfair and deceptive acts, by, among other things:

    a.   Willfully and knowingly making false statements of material fact to Muntasser in order to induce him to invest with Defendants—all while Muntasser was in Massachusetts.

    b.   Willfully and knowingly creating and disseminating to Muntasser fabricated financial statements while he was in Massachusetts.

    c.   Willfully and knowingly misappropriating Muntasser's investment.

    d.   Willfully and knowingly using extortionate means to try to persuade Muntasser not to take legal action against Defendants.

    e.   Willfully and knowingly falsely claiming payments of profits to Muntasser were merely return of his principal investment.

    f.   Willfully and knowingly failing to return Muntasser's investment in bad faith.

184.    Defendants' willful and knowing unfair and deceptive acts and practices took place primarily and substantially in Massachusetts as that element has been interpreted by the relevant case law.

185.    Defendants' unfair and deceptive acts and practices occurred in the conduct of trade or commerce, including the offering of securities.

186.    Muntasser was harmed as a result of Defendants' willful and knowing unfair and deceptive acts and practices.

187.    Muntasser sent a demand letter to Defendants on December 30, 2024, identifying Muntasser as the claimant, describing Defendants' unfair and deceptive acts and practices, and describing how such acts and practices caused him harm.  To date, Defendants have not made any offer of settlement.

188.     Muntasser is entitled to damages as a result of Defendants' willful and knowing violations of c. 93A.

## PRAYER FOR RELIEF

Muntasser prays that this Court:

A.       Enter Judgment in his favor and against Defendants on all Counts;

B.      Award Muntasser his compensatory damages;

C.      Award Muntasser treble damages pursuant to G. L. c. 93A;

D.      Award Muntasser treble damages pursuant to 18 U.S.C. § 1964(c);

E.      Award Muntasser his attorneys' fees and costs; and

F.      Award Muntasser such other relief as the Court deems just.

## DEMAND FOR JURY TRIAL

Muntasser hereby demands a trial by jury on all counts so triable.


Respectfully submitted,

/s/ *Douglas S. Brooks*
Douglas S. Brooks, BBO No. 636697
Libby Hoopes Brooks & Mulvey, P.C.
260 Franklin Street, Suite 1920
Boston, MA 02110
(617) 338-9300
dbrooks@lhbmlegal.com


Dated: June 26, 2025